UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DEVRA BYRON,

        Plaintiff,                               Case No. 11-13445
                                                        Honorable Thomas L. Ludington

v.

ST. MARY'S MEDICAL CENTER,

        Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

This case arises out of Plaintiff's claim that she was denied her rights under the Family Medical Leave Act ("FMLA"). The FMLA requires qualifying employers to provide employees unpaid leave for certain medical and family reasons. To qualify under the FMLA, an employer must be "engaged in commerce or in any industry or activity affecting commerce," and employ at least fifty employees, Monday through Friday, during at least twenty weeks of the year. 29 U.S.C. § 2611(4)(A)(i) (2009). Eligible employees are those that have worked for a qualifying employer for twelve months, or at least 1,250 hours during the previous twelve-month period. § 2611(2)(A)(i–ii). Relevant to this case, the FMLA entitles eligible employees up to twelve workweeks of leave per year "[b]ecause of a serious health condition" rendering an employee unable to perform her job. § 2612(a)(1)(D).

Defendant has moved for summary judgment of Plaintiff's claim. Because Plaintiff was entitled to FMLA leave when she fell ill on May 11, 2009, and because she placed Defendant on notice of her need for leave in a timely fashion, Defendant's Motion for Summary Judgment is denied.

**I**

Plaintiff Devra Byron began working for Defendant St. Mary's Medical Center on September 18, 1992. Pl.'s Resp. Ex. 1, ECF No. 19. Defendant is a qualifying employer under the FMLA. Def.'s Answer 3, ECF No. 6. Initially only a temporary employee, Plaintiff eventually became a full-time electrocardiography technician (EKG[1] tech). Def.'s Mot. 3, ECF No. 17. Her job involved performing 12 lead EKGs on patients throughout Defendant's hospital. *Id*. Although its technical function is complicated, a 12 lead EKG basically involves attaching electrodes to the human body to measure the rhythms of the heart.

Plaintiff testified that after she was hired, she received and later read an employee handbook. Def.'s Mot. Ex. 1, at 15. Through the handbook, and during new-hire orientation, Plaintiff became aware of Defendant's absentee policy. *Id.* at 18. The policy recognizes that there are occasions when employees will be unable to work due to illness or other valid reasons, but also that absences disrupt the ability to operate efficiently. Pl.'s Resp. Ex. 5. As such, Defendant's employees are "expected to report for work and complete their assigned shift as scheduled." *Id.* The policy defines an unscheduled absence as any not approved twenty-four hours in advance by a manager. *Id*.

Defendant's absentee policy outlines the consequences for accumulating unscheduled absences. Under the policy, six or seven absent occurrences within a rolling twelve-month period will result in a verbal or written warning. *Id*. Eight absent occurrences within a year may result in a suspension. *Id*. Nine occurrences may lead to termination. *Id.* It is important to note that for these calculations, "absent occurrences" are not simply days missed. Defendant's policy classifies an occurrence as either one shift, or "one group of consecutive work shifts," where an

---

[1] Although electrocardiography is sometimes abbreviated ECG; EKG is more commonly used, and stems from the German language term Elektrokardiogramm.

associate is not present as scheduled. *Id.* For example, being absent from scheduled shifts Monday through Wednesday, a total of three days, counts as only one occurrence for purposes of Defendant's policy. In addition to the consequences noted above, "A persistent or recurring trend of absences may be considered grounds for corrective action up to and including termination." *Id.*

**A**

Between August of 2005 and February of 2009, a period of forty-three months, Plaintiff was absent without permission from a total of thirty-three shifts and twenty-seven occurrences. Def.'s Mot. Exs. 5–6, 8–11. She received verbal or written warnings regarding her absences on August 3, 2006; August 1, 2007; February 11, 2008; September 24, 2008; January 10, 2009; and March 5, 2009. *Id.* With each warning, Plaintiff was told that any further incident would result in "further implementation of the absenteeism policy up to and including termination." *Id.*

Despite Plaintiff's frequent absences, the evidence shows Defendant was generous in its application of the absentee policy. Between April 2006 and March 2007, Plaintiff amassed nine absent occurrences, but her employment was not suspended or terminated. Def.'s Mot. Exs. 5–6. From February 5, 2007 to February 4, 2008, Plaintiff missed twelve shifts over nine occurrences, but again her employment was not terminated; only suspended for three days. *Id.* Ex. 8. After missing another eleven shifts and eight occurrences between June 2008 and February 2009, Plaintiff was suspended for a second time, without pay. *Id.* Ex. 11. She was warned that a "persistent or reoccurring trend of absence may be considered grounds for corrective action up to and including termination." *Id.*

During the beginning of 2009, Plaintiff also faced significant personal difficulties. She had separated from her husband and moved in with her sister, and was in the process of a

divorce. *Id.* Ex. 4, at 25, 28. Meanwhile her husband, an alcoholic, was dying of liver failure. *Id.* at 28. In March 2009, he was living in Brian's House, a hospice facility in Bay City, Michigan. Pl.'s Resp. Ex. 1, at 23. Despite the separation and proceeding divorce, Plaintiff attempted to care for him during his demise. *Id.*

Near the end of March, recognizing Plaintiff's personal struggles and her lackluster attendance record, Plaintiff's supervisor suggested she take FMLA leave. Def.'s Mot. Ex. 2, at 23. Plaintiff and her supervisor knew that if something prevented her from getting to work, she could lose her job. *Id.* Ex. 3, at 29. So Plaintiff filed a written application at the end of March 2009, and was granted an open-ended leave. *Id.* Ex. 2, at 24. She took about two weeks off at the beginning of April to be with her husband. *Id.* On April 15, Plaintiff's husband passed away, and she was granted additional time off for bereavement. *Id.* Ex. 3, at 31. After that time, Plaintiff was back to work. *Id.*

### B

Plaintiff was scheduled to work shifts on May 9, 10, and 11 of 2009. Pl.'s Resp. 8. Her shifts were scheduled from 7:00 a.m. until 3:30 p.m. Def.'s Mot. Ex. 15, at 46. During her May 9 and 10 shifts, Plaintiff began feeling a burning sensation in her sternum. Pl.'s Resp. Ex 1, at 34. Two cardiologists from Defendant's hospital advised her to "get it checked out." *Id.* On Sunday evening, May 10, she was unable to keep any food down except half of a saltine cracker. *Id.* Her pain and nausea persisted through the night and into the morning. *Id.*

Plaintiff woke on May 11, 2009 and knew she was too sick to work. *Id.* Ex. 1, at 101. Plaintiff claims that she called Janet Clayton that morning and informed Ms. Clayton she was too sick to work, and was going to the emergency room. *Id.* Janet Clayton was the hospital coordinator responsible for scheduling Plaintiff's shifts. Def.'s Mot. Ex. 14. According to

Plaintiff, she called Ms. Clayton at her home. *Id.* Ex. 15, at 42. Plaintiff asserted that Ms. Clayton told her, "get yourself taken care of and don't worry about it." *Id.*

Plaintiff then went to Defendant's emergency room. *Id.* She was admitted and diagnosed with acute pancreatitis. Pl.'s Resp. Ex. 3. During her stay, Plaintiff received a gastrointestinal (GI) cocktail. Def.'s Mot. Ex. 13, at 37. Although distasteful, the cocktail quickly improved Plaintiff's symptoms. *Id.* at 38. According to hospital records, she was "asymptomatic" upon her discharge just before 1:00 p.m. *Id.* at 39–40.

Plaintiff alleges that she proceeded to call Ms. Clayton again after she was released. *Id.* at 40. According to Plaintiff, she told Ms. Clayton she had been discharged from the hospital after being diagnosed with acute pancreatitis, that she was instructed to follow up with her primary care physician, and that she would provide her discharge papers for Ms. Clayton's records. *Id.* Ms. Clayton averred in a sworn affidavit, however, that she was never advised by Plaintiff that she would not be coming into work on May 11, and further, that she never received Plaintiff's ER discharge papers. Def.'s Mot. Ex. 14.

The next day, Plaintiff was scheduled to work again, and she arrived at work around 6:30 a.m. *Id.* Ex. 16, at 46. Contrary to Ms. Clayton, Plaintiff testified that, as promised, she delivered a copy of her ER discharge papers. *Id.* Ex. 15, at 44. There is no argument that Plaintiff's relationship with Defendant was strained to breaking. Just after 2:00 that afternoon, Plaintiff was escorted down to Human Resources. *Id.* Ex. 16, at 46. According to Plaintiff, she was provided a Union Steward, Eve Perry, who told her not to say anything during the upcoming meeting. *Id.* at 47. Plaintiff was then taken into a Human Resources office, where she was met by Kevin Flynn and Stephanie Peters. Pl.'s Resp. Ex. 8, at 8. It was a very short meeting, during which Plaintiff was informed that the previous day, May 11, had been her ninth absent

occurrence within twelve months. Def.'s Mot. Ex. 12. Plaintiff's employment with Defendant was then terminated. *Id.* Following Ms. Perry's advice, Plaintiff never claimed she was entitled to FMLA leave. *Id.* Ex. 17, at 50. She said nothing. *Id.* Eve Perry stated that a grievance would be filed, and then Ms. Peters recalls seeing Plaintiff pick up FMLA papers on her way out of the office. Pl.'s Resp. Ex. 8, at 8–9. Interestingly, Plaintiff denies that she did so. Def.'s Mot. Ex. 17, at 50.

On May 13, 2009, Plaintiff went to see her primary care physician, J. B. Johnson, M.D. Pl.'s Resp. Ex. 10. During the appointment, she had Dr. Johnson complete FMLA request forms. *Id.* Dr. Johnson, although with some lack of clarity, established that Plaintiff had been to the ER, diagnosed with acute pancreatitis, and would be incapacitated for ten days. *Id.* Further, Dr. Johnson advised Plaintiff to follow up with him in seven to ten days' time. *Id.* Plaintiff's memory was far from clear, but she thinks Dr. Johnson may have mailed the FMLA forms to Defendant at that time. Def.'s Mot. Ex. 18, at 53–54.

During the next few months, Plaintiff was involved with a three-step grievance process, foreshadowed by Ms. Perry. *Id.* Ex. 19, at 51. At each step her grievance was denied. *Id.* During the process, she never argued she was entitled to FMLA leave for her May 11, 2009 absence. *Id.* at 52. In October, it was agreed that Plaintiff's grievance would be dropped and Defendant would withdraw its protest to her claim for unemployment benefits, although Plaintiff denies this was done with her knowledge. Pl.'s Resp. Ex. 1, at 73. Then, on August 8, 2011, Plaintiff filed a complaint against Defendant, charging that she had been terminated in violation of her FMLA rights. Defendant's Motion for Summary Judgment followed.

## II

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby,* 477 U.S. 242, 251-52 (1986). All justifiable inferences from the evidence are drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## III

The FMLA provides eligible employees up to twelve weeks of unpaid leave each year if the employee has "a serious health condition" that prevents her from working. § 2612(a)(1)(D). The FMLA offers aggrieved employees a private right of action under two theories: "the interference or entitlement theory . . . and the retaliation or discrimination theory." *Branham v. Gannett Satellite Information Network, Inc.*, 619 F.3d 563, 568 (6th Cir. 2010) (citations omitted) (internal quotation marks omitted). Plaintiff brings suit under both theories, claiming that Defendant interfered with her rights in denying her FMLA leave, and terminated her in retaliation for taking leave. Pl.'s Resp. 14. To prevail on either claim, Plaintiff must prove that: (1) she was entitled to FMLA leave, § 2612(a)(1); and (2) she gave Defendant notice of her intention to take that leave. § 2612(e)(1). Defendant argues Plaintiff was not entitled to FMLA leave, and even if she was, failed to give notice of her intention to take it. Each issue will be addressed in turn.

**A**

Plaintiff's FMLA entitlement hinges on whether she suffered from a "serious health condition." The FMLA provides that any employee suffering from a "serious health condition" that prevents her from doing her job qualifies for leave. § 2612(a)(1)(D). On this point, Plaintiff has satisfied her burden. Viewing the facts in Plaintiff's favor, a reasonable jury could conclude that she was entitled to FMLA leave on May 11, 2009.

Any illness that involves inpatient care in a hospital or continuing treatment by a health care provider is a "serious health condition" under the FMLA. § 2611(11). Plaintiff does not claim she ever required inpatient care, although it was offered, so her claim relies on her need for continuing treatment. Department of Labor regulations define a serious health condition requiring continuing treatment as either, among other things, "Incapacity and treatment," or "Conditions requiring multiple treatments." 29 C.F.R. § 825.115 (a), (e) (2009). Plaintiff contends that her acute pancreatitis was both.

As to the first, "Incapacity and treatment," Plaintiff's argument is without merit. Incapacity and treatment specifically covers a "period of incapacity of more than three consecutive, full calendar days, and any *subsequent* treatment or period of incapacity . . ." *Id*. at § 825.115 (a) (emphasis added). There is no argument to be made that Plaintiff was prevented from doing her job for three consecutive days that included or commenced before May 11, 2009. It is undisputed she did not work on May 11, and that she visited Defendant's emergency room on that day. But it is also undisputed that she worked her full shift the day before, and would have done so the day after had she not been terminated before day's end. Additionally, Plaintiff testified she was asymptomatic by 1:00 p.m. after treatment. Def.'s Mot. Ex. 13, at 38. Even if

her morning in the ER is considered incapacity for one full calendar day, it certainly cannot be stretched to cover three.

Although Dr. Johnson ordered Plaintiff to take ten days off on May 13, Plaintiff admits they never discussed her being unable to work. *Id*. Ex. 22, at 58. According to Plaintiff, she was given the time off to get blood work done, not because she was incapacitated. *Id*. Even if Dr. Johnson's order did initiate incapacity and treatment after Plaintiff's May 13 appointment, it would not cover May 11 due to her clear ability to do her job on May 12. No matter how the record is viewed, no reasonable jury could find Plaintiff's illness meets the standard for incapacity and treatment.

The same cannot be said of Plaintiff's claim concerning conditions that require multiple treatments. A condition requiring multiple treatments need not actually cause incapacity for three days. Instead, the FMLA requires only that a condition *would* cause incapacity for three days "in the absence of medical intervention or treatment . . . ." § 825.115 (e)(2). If satisfied, then any period of absence to receive multiple treatments for the condition, including recovery, would qualify for FMLA leave. § 825.115 (e).

Plaintiff's hospital discharge instructions indicate that "Pancreatitis . . . if not treated promptly and correctly" can lead to "many complications." Pl.'s Resp. Ex. 3. The instructions explain, "When diagnosed with Pancreatitis, you will almost always be admitted to the hospital for fluid replacement, and control of pain and vomiting. Surgery may be indicated in some cases to correct the problem causing the disease." *Id*. The instructions go on to detail numerous reasons to seek emergency medical attention even after treatment. *Id*.

Plaintiff received treatment for her pancreatitis on May 11, May 13, and was instructed to follow up a third time within seven to ten days. *Id*. Ex. 10. She was advised to sleep and rest as

much as possible, both at the hospital and by Dr. Johnson. *Id.* Exs. 3, 10. Dr. Johnson also ordered her off work (had she been working) for an additional ten days. *Id*. Ex. 10. Given the nature of pancreatitis described in her discharge instructions, along with the fact that Plaintiff was instructed to receive three treatments, a reasonable jury could find she was qualified for FMLA leave under "Conditions requiring multiple treatments." § 825.115 (e). As such, her May 11 absence from work for treatment would qualify. It follows that judgment as a matter of law in favor of Defendant is not proper on this issue.

**B**

Even if Plaintiff was eligible for leave on May 11, the question of whether she satisfied the FMLA notice standards remains. Although it is a close question, Plaintiff has submitted enough evidence to withstand summary judgment on this point as well.

The FMLA provides notice requirements for both employees and employers. §§ 825.300, 302–03. Although providing requirements for both foreseeable and unforeseeable leave, only unforeseeable requirements are pertinent to this case. Plaintiff's acute pancreatitis is obviously not the type of foreseeable leave the Act envisions. According to the section dealing with employee notice for unforeseeable leave, an employee must provide notice to the employer "as soon as practicable under the facts and circumstances of the particular case." § 825.303(a). In addition, employees are required to provide "sufficient information for an employer to reasonably determine whether the FMLA may apply . . . [d]epending on the situation, such information may include that a condition renders the employee unable to perform the functions of the job . . . ." § 825.303(b). Once an employee has satisfied this burden, the employer is expected to gather any additional information that is required to determine if FMLA leave applies. *Id.*

The employer's burden is further outlined in the section that addresses employer notice responsibilities. Specifically, when an employer acquires knowledge that an employee's leave may qualify for FMLA leave, "the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days . . ." § 825.300(b)(1). If an employer fails in this regard, it may "constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." § 825.300(e).

The evidence in this case demonstrates that Plaintiff invoked FMLA protection, at least in viewing the evidence from her point of view. To give notice for unforeseeable FMLA leave, "an employee must provide notice and a qualifying reason for requesting the leave." *Brohm v. JH Props., Inc.,* 149 F.3d 517, 523 (6th Cir. 1998). Because an employee need not expressly invoke the FMLA, "the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 723 (6th Cir. 2003) (citing *Hammon v. DHL Airways, Inc.,* 165 F.3d 441, 450 (6th Cir. 1999)).

Plaintiff's actions indicated an FMLA-related reason could have been the source of her leave, and that she was unable to work because of it. Defendant was thereby placed on notice. According to Plaintiff's version of events, she called Janet Clayton the very morning she realized she would not be able to work. Ms. Clayton was the coordinator in charge of scheduling employees in Plaintiff's unit, and this would be sufficient to give Defendant notice Plaintiff needed the day off. But Plaintiff went further. She told Ms. Clayton she was too sick to work and that she was going to the emergency room.

Plaintiff also claims she called Ms. Clayton after she got out of the ER, relayed her diagnosis, indicated that she had to follow up with her own doctor, and promised to furnish the

discharge papers for Ms. Clayton's records. According to Plaintiff, she then *did* deliver those papers the next day, which confirmed her diagnoses of acute pancreatitis. Then, after Plaintiff was terminated, Stephanie Peters, Defendant's HR manager, physically watched her pick up FMLA request forms as she left the human resources office. Defendant knew all of this information within two days of Plaintiff becoming aware of her need to take the day off, within FMLA's requirement for "as soon as practicable."

Defendant's argument that it did not know Plaintiff was requesting FMLA leave until 2011 is unpersuasive. Plaintiff's alleged actions, taken as true, establish it was Defendant's obligation to inquire further to ascertain if FMLA leave was necessary. The Seventh Circuit found, when addressing similar facts, that "the Department of Labor regulations repeatedly emphasize that it is the employer's responsibility to determine the applicability of the FMLA and to consider requested leave as FMLA leave." *Price v. City of Fort Wayne*, 117 F.3d 1022, 1026 (7th Cir. 1997). For example, "[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed . . . The employer will be expected to obtain any additional required information through informal means." § 825.303(b).

In *Cavin,* 346 F.3d at 725, the plaintiff informed the defendant he had been in a motorcycle accident and was just released from the hospital. There, the court noted that based on those facts, it was Defendant's burden to inquire further to determine if FMLA leave applied. *Id*. As in *Cavin*, if Defendant here lacked sufficient information about Plaintiff's reason for taking leave, it should have inquired further. Plaintiff informed Defendant she was too sick to work, was going to the emergency room; and later, that she had been diagnosed with pancreatitis. Defendant cannot claim ignorance where it is self-imposed.

Further, the cases Defendant relies on to argue Plaintiff's notice was insufficient are distinguishable. In *Brenneman v. MedCentral Health System*, 366 F.3d 412, 425 (6th Cir. 2004), the plaintiff simply stated he was "not doing well" and failed to state his absence was related to his diabetes. In *Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005), the plaintiff only told his employer he "twisted his knee" and planned to get it evaluated. He never indicated he needed time off, or requested FMLA forms. *Id.* Then, after receiving ibuprofen and an ice-pack, he returned to work. *Id.*

In *Henegar v. Daimler-Chrysler Corp.*, 280 F. Supp. 2d 680, 686 (E.D. Mich. 2003), Plaintiff chose the "ill" option on his employer's phone automated system, and never attempted any further contact. The plaintiff in *Woods v. Daimler Chrysler*, 409 F.3d 984, 992 (8th Cir. 2005), delivered two voice-messages to the defendant indicating he was going to see a doctor, and then provided a doctor's note that referred only to "evaluation and treatment." Similarly, the other cases Defendant cites simply show FMLA notice standards require more than vague references to illness. In this case, accepting Plaintiff's story as true, she did much more.

It should be noted that there are significant factual discrepancies concerning how Defendant acquired Plaintiff's FMLA request forms. However, given the fact that Plaintiff put Defendant on notice simply with her conduct on May 11 and 12, this factual discrepancy is not relevant to the question of whether Plaintiff may present her claim to a jury. Defendant's summary judgment motion will be denied because a reasonable jury could find that Plaintiff placed Defendant on notice of her need to take FMLA leave.

## IV

For these reasons, Defendant's motion for summary judgment is denied.

s/Thomas L. Ludington  
THOMAS L. LUDINGTON  
United States District Judge

Dated: September 11, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 11, 2012.

s/Tracy A. Jacobs  
TRACY A. JACOBS